IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:11-cv-___-__ |
| ) | |
| CHESHIRE MEDICAL CENTER, ) | |
| KEENE HEALTH ALLIANCE, and ) | JURY TRIAL DEMANDED |
| DARTMOUTH-HITCHCOCK CLINIC d/b/a ) | |
| DARTMOUTH-HITCHCOCK KEENE, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

The United States of America ("United States") alleges as follows:

### INTRODUCTION

1. This is a civil action brought to redress discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12188, and the United States Department of Justice's regulations implementing the ADA, 28 C.F.R. Part 36.

2. The United States alleges, *inter alia*, that Defendants Cheshire Medical Center, Keene Health Alliance, and Dartmouth-Hitchcock Clinic d/b/a Dartmouth-Hitchcock Keene (collectively, "CMC/DHK") have repeatedly failed to ensure that individuals who are deaf or hard of hearing are afforded opportunities to participate in or benefit from CMC/DHK's services and facilities that are equal to those opportunities afforded others.

3. The United States Attorney General has reasonable cause to believe that Defendants have engaged in a pattern or practice of discrimination under Title III of the ADA, 42 U.S.C. § 12188(b)(1)(B)(i), and its implementing regulation at 28 C.F.R. § 36.503(a), and that Defendants' discrimination against persons who are deaf or hard of hearing and those related to or associated with them raises an issue of general public importance under 42 U.S.C. § 12188(b)(1)(B)(ii) and 28 C.F.R. § 36.503(b).

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 12188(b)(1)(B) & (b)(2) and 28 U.S.C. §§ 1331 and 1345. The Court may grant declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5. Venue lies in this District pursuant to 28 U.S.C. § 1391, because the claims arose in the District of New Hampshire.

## THE PARTIES

6. Plaintiff is the United States of America.

7. Defendant Cheshire Medical Center is a private non-profit corporation, incorporated in the state of New Hampshire, which does business as CMC/DHK, a hospital and professional offices of health care providers located, inter alia, at 580-90 Court Street in Keene, New Hampshire. Accordingly, Defendant Cheshire Medical Center is a public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(F), and its implementing regulation at 28 C.F.R. § 36.104.

8. Defendant Keene Health Alliance is a private non-profit corporation, incorporated in the state of New Hampshire, which does business as CMC/DHK, a hospital and professional

offices of health care providers located, inter alia, at 580-90 Court Street in Keene, New Hampshire. Accordingly, Defendant Keene Health Alliance is a public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(F), and its implementing regulation at 28 C.F.R. § 36.104.

9. Defendant Dartmouth-Hitchcock Clinic d/b/a Dartmouth-Hitchcock Keene is a non-profit corporation, incorporated in the state of New Hampshire, which does business as CMC/DHK, a hospital and professional offices of health care providers located, inter alia, at 580-90 Court Street in Keene, New Hampshire. Dartmouth-Hitchcock Clinic has a principal office address of One Medical Center Drive in Lebanon, New Hampshire. Accordingly, Defendant Dartmouth-Hitchcock Clinic d/b/a Dartmouth-Hitchcock Keene is a public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(F), and its implementing regulation at 28 C.F.R. § 36.104.

## FACTUAL ALLEGATIONS

**Laura and Jeanne Waldren**

10. Laura Waldren is deaf and is a person with a disability within the meaning of Title III of the ADA, 42 U.S.C. § 12102, and its implementing regulation at 28 C.F.R. § 36.104.

11. Jeanne Waldren is Laura Waldren's mother. Although Jeanne Waldren has some ability to communicate via signing, she has had limited training in the use of American Sign Language ("ASL"). She is not a qualified sign language interpreter and is unable to interpret effectively, accurately, and impartially, both receptively and expressively, and cannot interpret specialized medical vocabulary. She is not licensed as a sign language interpreter in New Hampshire.

12. Laura Waldren uses ASL for in-person communications. ASL has a unique syntax and structure pattern, and does not correlate one-to-one with written or spoken English. Although Laura Waldren has some limited ability to read lips and to read and write English, ASL is her primary language and she cannot effectively communicate via lipreading or written English when discussing complicated matters such as health care treatment options, diagnoses, and treatment.

13. Effective communication with Laura Waldren in a hospital or clinic setting requires a qualified sign language interpreter, at least in any circumstance where the information to be conveyed to Laura Waldren is important or related to her medical history, an evaluation, a diagnosis, a treatment, or a review or modification of her health status, as well as reasonably foreseeable health care activities, including testing, procedures and meetings with hospital personnel about follow-up care and other aspects of clinical care or hospitalization.

**Laura Waldren's First Visit to CMC/DHK in October, 2009**

14. On or about October 5, 2009, Laura Waldren made a call, via video relay service, to CMC/DHK to schedule a medical appointment at the Women's Health Center. During that call, she requested that a sign language interpreter be provided at the time of her appointment. She was scheduled for an appointment on October 7, 2009, at 3:00 p.m.

15. Laura Waldren arrived at the Women's Health Center on October 7, 2009, for her scheduled 3:00 p.m. appointment at the Women's Health Center. She inquired about the sign language interpreter, but none was provided. She was not asked to sign a waiver of her right to have a qualified interpreter, even though CMC/DHK's policy would have required it. A nurse

wrote Laura Waldren a note confirming that there would not be an interpreter available to ensure effective communication with her.

16. CMC/DHK had a written policy in place regarding services for individuals with hearing impairments. Among other things, the policy provides that CMC/DHK "will provide a qualified sign . . . language interpreter within a reasonable period to all patients/families requesting one." Despite this policy, a qualified sign language interpreter was not provided to Laura Waldren on October 7, 2009, although she had requested one two days earlier at the time she scheduled the appointment.

17. At the October 7, 2009, appointment, her health care provider provided Ms. Waldren with a diagnosis and proposed treatment. Although that provider noted that she "got consent from patient," Laura Waldren did not understand the diagnosis or what treatment was proposed. The provider communicated through written notes, but Laura Waldren did not understand those notes. She normally relies upon a qualified sign language interpreter to assist her with understanding medical documents and information. No such interpreter was made available to her, despite her request two days before the appointment that one be made available.

**Laura Waldren's Second Visit to CMC/DHK in October, 2009**

18. Laura Waldren's medical condition did not improve, and she continued to experience pain. Therefore, at approximately 10:00 a.m., on October 10, 2009, Ms. Waldren called the CMC/DHK Emergency Department, via video-relay service. She informed the Emergency Department that she would be coming in for care and that she needed a sign language interpreter.

19. Laura Waldren contacted her mother, Jeanne Waldren, in Cheshire, Vermont, to have Jeanne Waldren drive her to CMC/DHK. Jeanne Waldren, along with Laura Waldren's nine-year-old daughter, drove to Laura Waldren's residence and then drove Laura Waldren to CMC/DHK. No qualified sign language interpreter was available. When Jeanne Waldren requested a qualified sign language interpreter for her daughter, she was informed that DeafTalk, a video interpreting service, was what they used in the Emergency Department. Through her mother, Laura Waldren again requested an on-site qualified sign language interpreter. Laura Waldren was not asked to execute a written waiver of her right to a qualified sign language interpreter.

20. Laura Waldren, Jeanne Waldren, and Laura Waldren's daughter were escorted to an Emergency Department triage room, where they met with a nurse. The nurse set up DeafTalk. Laura Waldren again requested an on-site qualified sign language interpreter because, in her experience, DeafTalk did not provide her with effective communication.

21. Jeanne Waldren attempted to assist in communication with the nurse. She did not want to do so, but believed she had no other option if her daughter was to receive the medical care she seemed to need. The situation was complicated further by the presence of Laura's nine-year-old daughter. Unlike other patients' family members who could simply provide emotional support, Jeanne Waldren had little choice but to undertake the substantial burden of attempting to facilitate communication between Laura and CMC/DHK's physicians, nurses, and other staff, and to attempt to advocate for Laura's right to communicate effectively with the physicians, nurses, and other staff.

22. After a period of waiting, Laura Waldren, Jeanne Waldren, and Laura Waldren's nine-year-old daughter were escorted to an Emergency Department treatment room. A nurse was in the room, attempting to set up DeafTalk. After a period of time, the DeafTalk connection was made, but there was a further wait for an interpreter to come on the line. The nurse had to turn her attentions away from Laura Waldren to DeafTalk because the device was fading in and out.

23. The Emergency Department physician joined them in the treatment room, but there continued to be problems with DeafTalk, leading to confusion by the Waldrens. They did not understand what was happening or what the medical staff was trying to communicate. Deaf Talk was disconnected and not used again.

24. The physician examined Laura Waldren and decided to contact an on-call specialist. At one point, he wrote a note trying to explain that he needed to call a specialist. Laura Waldren did not understand the diagnosis or the proposed mode of treatment. In front of Laura's nine-year-old daughter, Jeanne Waldren attempted to explain to Laura what the specialist was. Jeanne Waldren was concerned about her ability to convey the medical information and terminology to Laura correctly and accurately, and would have preferred that she not be placed in the position of having to attempt to do so. The use of DeafTalk and written notes had not resulted in effective communication.

25. A nurse then escorted Laura Waldren to another treatment room, leaving Jeanne Waldren and Laura's young daughter behind to wait in the first treatment room. Neither Jeanne Waldren nor Laura Waldren understood the nature of the procedure that was proposed.

26.     In the second treatment room, Laura Waldren was alone with CMC/DHK staff because her mother had been left in the first treatment room.  No effort was made to set up DeafTalk.  No on-site qualified interpreter was made available to ensure effective communication.  The nurse attempted to communicate with Laura by writing notes and pointing to pictures in a book.  Laura did not understand what the nurse was attempting to convey and the attempted communication was not effective.

27.     The specialist subsequently entered the second treatment room.  He communicated with Laura Waldren in writing "as to procedure and consent agreed."  The specialist's handwriting was illegible.  Laura Waldren did not understand either the procedure or the nature of the consent she was signing.  No effort was made to set up DeafTalk or obtain an on-site qualified interpreter to ensure that Laura Waldren understood what was happening and that her consent was informed.  The attempt at communication through written notes was not effective.

28.     The specialist began the procedure.  Laura Waldren attempted to have him stop the procedure by vigorously signing the American Sign Language sign for "stop" and vocalizing loudly.  The doctor completed the procedure without stopping.

29.     Some time after the procedure was completed, a nurse brought Laura Waldren back to the first treatment room where her mother and daughter were waiting.  Although Jeanne Waldren requested to speak with the specialist, she was not given the opportunity to do so.  Laura Waldren was given written after-care instructions.  Her mother asked various questions of the nurse about those instructions, and attempted to convey the information to Laura Waldren.  Unlike other patients' family members who could simply provide emotional support,

Jeanne Waldren had little choice but to undertake the substantial burden of attempting to facilitate communication between her daughter and CMC/DHK's physicians, nurses and other staff.

30. No effort was made to set up DeafTalk to attempt effective communication with Laura Waldren about her after-care. Laura Waldren did not understand the after-care instructions at all, except that she was to follow up with her primary care provider in one week. CMC/DHK did not provide a qualified sign language interpreter to ensure that the after-care instructions were communicated effectively and never communicated with Laura or Jeanne Waldren about the status of their requests for an on-site qualified sign language interpreter during this Emergency Department visit.

### Laura Waldren's Third Visit to CMC/DHK in October, 2009

31. On October 14, 2009, prior to her scheduled follow-up appointment, Laura Waldren contacted the Woman's Health Center at CMC/DHK by video relay service to tell them she needed to be seen right away. She was a long-time patient of the Woman's Health Center and was known to the Center as a deaf patient who needed a qualified sign language interpreter for effective communication. Jeanne Waldren drove Laura to the CMC/DHK Woman's Health Center.

32. When the Waldrens arrived, no sign language interpreter was present. Jeanne Waldren had to assist in communication between her daughter and the staff at the Center. Jeanne Waldren did not want to assist, but felt she had no choice because of her daughter's obvious need for medical care. Because she has no medical background, Jean Waldren felt unprepared and uncomfortable in attempting to explain medical matters to Laura. Unlike other patients' family

members who could simply provide emotional support, Jeanne Waldren had little choice but to undertake the substantial burden of attempting to facilitate communication between her daughter and CMC/DHK's physicians, nurses, and other staff and to attempt to advocate for Laura's right to communicate effectively with the physicians, nurses, and other staff.

33.     Jeanne Waldren went with Laura into the treatment room to assist with communication. No effort was made to offer or to set up DeafTalk. Nothing was said to the Waldrens regarding efforts to obtain or the availability of an on-site qualified sign language interpreter. Laura Waldren specifically asked for an on-site sign language interpreter. None was provided and no explanation was given to the Waldrens by CMC/DHK staff.

34.     The physician examined Laura Waldren and determined that she needed immediate day surgery. Preparatory to surgery, the physician ordered various tests. Although Jeanne Waldren attempted to explain the testing to Laura, neither she nor Laura had any real understanding of the tests or their purpose. Neither DeafTalk nor an on-site qualified sign language interpreter were offered by the CMC/DHK staff. Laura Waldren was not asked to sign a waiver of her right to have a qualified sign language interpreter. There was not effective communication between Laura Waldren and the CMC/DHK staff.

35.     After the testing was complete, Laura was taken to a treatment room. Her mother remained with her and the staff expected Jeanne Waldren to continue to act as an interpreter as Laura was being prepared for surgery. The physician used a large medical book to assist in explaining the problem and the treatment. This method of communication was not effective to allow Laura Waldren either to understand what was taking place or to communicate her needs or

concerns to the staff at CMC/DHK. Laura Waldren was unable to communicate effectively via written English or lipreading.

36. Jeanne Waldren attempted to interpret on behalf of her daughter, but did not want to be put in that position. Jeanne Waldren did not completely understand what the problem was. It was stressful for her to be in this position. Unlike other patients' family members who could simply provide emotional support, Jeanne Waldren had to undertake the substantial burden of attempting to facilitate communication between her daughter and CMC/DHK's physicians, nurses, and other staff and to attempt to advocate for Laura's right to communicate effectively with the physicians, nurses, and other staff.

37. When Laura was taken to the operating room, her mother did not accompany them. Her mother was not with her when Laura was asked to sign various consent forms. Laura did not understand the forms or the procedure. The CMC/DHK staff did not take steps to ensure that the communication with Ms. Waldren was effective and that her consent was informed.

38. Following the surgery, a staff member brought Jeanne Waldren to the recovery room so that she could act as an interpreter for her daughter. Jeanne Waldren felt obligated to perform interpreter services, although she did not want to do so. Unlike other patients' family members who could simply provide emotional support, Jeanne Waldren had little choice but to undertake the substantial burden of attempting to facilitate communication between her daughter and CMC/DHK's physicians, nurses, and other staff and to attempt to advocate for Laura's right to communicate effectively with the physicians, nurses, and other staff.

39. The medical records contain notations that demonstrate the need for interpreter services. For example, the pre-admission/anesthesia consult form notes that Laura Waldren was

"[d]eaf - can lip read some - looks to Mom to interpret everything." Jeanne Waldren's efforts to assist her daughter were not sufficient to ensure effective communication between her daughter and the CMC/DHK staff.

40. Laura Waldren was discharged on October 14, 2009. Although CMC/DHK's records noted that she was deaf, no qualified sign language interpreter was provided to ensure that either she understood the after-care of discharge instructions or was able to have her questions about her condition answered. Because no qualified sign language interpreter was provided at any time during her visit and surgery, Laura Waldren was unable to communicate effectively with the physicians, nurses, and staff whom she encountered.

41. Laura Waldren and Jeanne Waldren suffered emotional injuries resulting from CMC/DHK's conduct in October, 2009.

42. In 2004, CMC was sued for ADA violations resulting in ineffective communication between CMC staff and a deaf patient. On September 15, 2005, CMC signed a settlement agreement ("Prior Settlement Agreement") with the Plaintiff and the Disability Rights Center, Concord, NH, which required CMC to establish policies and training to ensure effective communication with patients and their companions who are deaf and hard-of-hearing. That settlement agreement was in effect for two years and expired on September 15, 2007.

43. The Prior Settlement Agreement required that CMC make an initial assessment of a deaf or hard-of-hearing patient's need for auxiliary devices when an appointment was scheduled, a patient arrives, or CMC received notice that a deaf or hard-of-hearing individual is on the way, "whichever is earlier." CMC committed to providing whichever of the listed assistive aids, which included qualified sign language interpreters, "may be necessary for

effective communication, within a reasonable time after making such determination" or assessment of the need for auxiliary aids.

44. Under the Prior Settlement Agreement, all efforts to obtain a qualified sign language interpreter were to be documented. It further provided that individuals were to be notified of their right to an on-site qualified sign language interpreter, but that DeafTalk was available until a qualified interpreter arrived. CMC also agreed that a "signed waiver shall be required for individuals waiving their right to an on-site interpreter."

45. The Prior Settlement Agreement also set forth a policy that CMC would "never require a family member, companion, case manager, advocate or friend of a Patient or Companion . . . to interpret or facilitate communications between Hospital Personnel and such Patient or Companion." Such facilitation was to occur only if the patient did not object, the person wished to provide such assistance, and if "such use is necessary or appropriate under the circumstances, giving appropriate consideration to any privacy issues that may arise."

46. CMC/DHK's existing written policies were not revised to bring them into full compliance with the terms of the Prior Settlement Agreement, at least as of May, 2010.

47. In October, 2009, Laura Waldren was not offered an on-site qualified sign language interpreter on any of her three visits to CMC/DHK. In October, 2009, CMC/DHK did not document any efforts they may have made to obtain on-site qualified sign language interpreters for any of Laura Waldren's three visits to CMC/DHK. In October, 2009, CMC/DHK did not seek or obtain a signed written waiver from Laura Waldren of her right to have an onsite qualified sign language interpreter present for any of her three visits to CMC/DHK.

48. CMC/DHK staff did not ensure that Laura Waldren did not object, that Jeanne Waldren wished to provide such assistance, or that privacy and other issues were taken into consideration before using Jeanne Waldren to interpret in the communication between Laura Waldren and CMC/DHK staff on October 10, 2009, and October 14, 2009. In fact, Laura Waldren did not want her mother to have to interpret, Jeanne Waldren did not want to feel obliged to interpret, and the nature of Laura Waldren's condition was so personal that considerations of privacy militated against the use of a family member to interpret for Ms. Waldren.

## CAUSES OF ACTION

49. CMC/DHK maintains a policy and practice of not providing qualified sign language interpreters and other auxiliary aids or services to individuals with disabilities who are deaf or hard of hearing. Alternatively, CMC's conduct discriminated against Laura Waldren or deaf or hard-of-hearing individuals and their companions in a manner that presents "a case of general public importance" under 42 U.S.C. § 12188(b)(1)(B)(ii) and 28 C.F.R. § 36.503(b).

50. CMC/DHK's failure to provide qualified sign language interpreters and other auxiliary aids or services to individuals with disabilities who are deaf resulted in ineffective communication between medical personnel and individuals with disabilities who are deaf.

51. CMC/DHK discriminated against individuals with disabilities who are deaf or hard of hearing by excluding them from participation in and denying them the benefits of its services, programs, or activities, and by subjecting them to discrimination on the basis of disability, in violation of section 302 of Title III of the ADA, 42 U.S.C. § 12182, and its implementing regulations at 28 C.F.R. Part 36.

52. CMC/DHK subjected Laura Waldren, and other qualified individuals with disabilities who are deaf or hard of hearing, to discrimination on the basis of disability in the provision of services, programs, or activities of a public accommodation, under section 302 of the ADA, 42 U.S.C. § 12182, and its implementing regulations at 28 C.F.R. pt. 36, by *inter alia*:

(a) failing to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services (including qualified sign language interpreters and TTYs), in violation of 42 U.S.C. § 12182(b)(2)(A)(iii) and its implementing regulation at 28 C.F.R. § 36.303;

(b) failing to afford individuals with disabilities who are deaf or hard of hearing, on the basis of the disability or disabilities of such individuals, with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that afforded to other individuals by failing to provide auxiliary aids and services (including qualified sign language interpreters and TTYs) that would permit individuals with disabilities who are deaf and hard of hearing from being able to receive health care treatment and participate in their health care decision making in the same manner as other individuals, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and its implementing regulation at 28 C.F.R. § 36.202(b);

(c) failing to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, by failing to modify its policies, practices, or procedures to ensure that individuals with disabilities who are deaf or hard of

15

hearing receive qualified sign language interpreters and appropriate auxiliary aids and services (including TTYs) that are necessary for them to communicate effectively, in violation of 42 U.S.C. § 12182(b)(2)(A)(iii), and its implementing regulation at 28 C.F.R. § 36.303(c); and

    (d)    Defendants CMC/DHK subjected Jeanne Waldren and others who are known to have a relationship or association with a person with a disability to discrimination by excluding or otherwise denying equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to them because of the known disability of an individual with whom they are known to have a relationship or association, in violation of 42 U.S.C. § 12182(b)(1)(E), and its implementing regulation at 28 C.F.R.§ 36.205, by forcing Jeanne Waldren and others into the role of communication facilitator that was inappropriate and harmful under the circumstances, thus depriving them of their ability to interact normally with their deaf companions and with the staff at CMC/DHK.

53.    Laura Waldren and other individuals with disabilities who use sign language for communication and rely upon other auxiliary aids and services have been and will continue to be harmed if they return to CMC/DHK unless CMC/DHK is required to provide effective communication and otherwise comply with the requirements of Title III of the ADA, 42 U.S.C. §§ 12181-12188, its implementing regulation at 28 C.F.R. Part 36.

THEREFORE, the United States of America requests that this Court grant the following relief:

    (a)    declare that the discriminatory practices, policies, and procedures of Defendants as set forth above, violate Title III of the ADA, 42 U.S.C. §§ 12181-12188, and the U.S. Department of Justice's implementing regulation, 28 C.F.R. Part 36;

  (b) enjoin Defendants, their officers, agents, and employees, and all other persons in active concert or participation with Defendants, from discriminating on the basis of hearing disabilities, or on the basis of relationship or association with a person with a hearing disability, against any individual seeking goods or services from Defendants;

  (c) order Defendants to furnish appropriate auxiliary aids and services, including qualified sign language interpreters, to persons who are deaf or hard of hearing when necessary for effective communication;

  (d) order Defendants to develop and implement policies and procedures to provide all appropriate auxiliary aids and services when required for effective communication with patients who are deaf or hard of hearing and who are receiving emergency or non-emergency care; with family members and companions who are associated with patients who are deaf or hard of hearing and who are receiving medical care; and with any other family members or companions who are deaf or hard of hearing and who are associated with hearing patients, deaf patients, or hard-of-hearing patients;

  (e) order Defendants to design and implement appropriate staff training programs to ensure that all its hospital personnel who have contact with members of the public are knowledgeable about the policies related to the provision of goods and services to persons with disabilities, including that each such person knows how to secure appropriate auxiliary aids and services for persons who are deaf or hard of hearing;

  (f) enjoin Defendants, their officers, agents, and employees, and all other persons in active concert or participation with Defendants, from discriminating against any individual

because that individual has opposed any act or practice which is unlawful under the ADA or because that individual made a charge, testified, assisted, or participated in this action;

  (g) enjoin Defendants, their officers, agents, and employees, and all other persons in active concert or participation with Defendants, from coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of the civil rights at issue in this action;

  (h) award monetary damages to Laura Waldren and Jeanne Waldren to compensate them for injuries resulting from such discrimination, including damages for emotional distress, pain and suffering;

  (i) assess a civil penalty against Defendant as authorized by 42 U.S.C. § 12188(b)(2)(C) to vindicate the public interest; and

  (j) order such other appropriate relief as the interests of justice may require.

Respectfully Submitted,

ERIC HOLDER
United States Attorney General

/s/ Thomas E. Perez
THOMAS E. PEREZ
Assistant Attorney General

JOHN P. KACAVAS
United States Attorney
District of New Hampshire

By: /s/ Gretchen Leah Witt
Gretchen Leah Witt, N.H. Bar No. 2775
Chief, Civil Division
53 Pleasant Street, Fourth Floor
Concord, NH 03301
(603) 225-1552
Gretchen.Witt@usdoj.gov

Dated: October 11, 2011